CLAUDE J. AUTIN, PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket No. 4704–92.                    Filed June 14, 1994.

*E.M. Quijano* and *Timothy W. Burgmeier*, for petitioner.
*Stevens E. Moore*, for respondent.

WELLS, *Judge*: Respondent determined a deficiency in petitioner's Federal gift tax in the amount of $1,649,736 and an addition to tax under section 6651(a)(1) of $412,434. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision are: (1) Whether the change of record ownership of stock in Louisiana International Marine, Inc., from petitioner to his son during June 1988 was a transfer of property that constituted a gift for Federal gift tax purposes at that time;[1] and (2) whether petitioner is liable for an addition to tax for failure to file a Federal gift tax return under section 6651(a)(1) for taxable year 1988.

### FINDINGS OF FACT

Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91. The parties' stipulations are incorporated into this opinion by reference. Petitioner resided in Gretna, Louisiana, when he filed his petition.

*Petitioner's Background*

Petitioner left high school after 2 years but later received the equivalency of a high school diploma. Petitioner never attended college, and he does not have any professional licenses.

When petitioner was approximately 15 years old and still enrolled in high school, he worked at Higgins Industry. After dropping out of high school, he worked as a "roughneck" for an oil company, R.H. Gracey Contracting Co. Petitioner left the R.H. Gracey Contracting Co. when he was drafted into the U.S. Army. He served in the Army for 14 months at Camp Lee, Virginia. After serving in the Army, petitioner briefly worked as a roughneck. During 1947, petitioner left his position as a roughneck to reopen his father's moss processing business.

On October 22, 1947, petitioner married his first wife, Ruth Ella Marie Rials (Ruth Autin). Petitioner and Ruth Autin had one child, a son named Bobby C. Autin (petitioner's son). Petitioner's son was born on September 28, 1949, and is petitioner's only child.

---

[1] On Feb. 5, 1993, petitioner filed a motion for separate trials on the issue of whether petitioner made a gift of stock during 1988 and the issue of the proper valuation of the stock if petitioner did indeed make a gift during 1988. We granted petitioner's motion and severed the valuation issue from the instant case.

## Petitioner's Early Years in the Marine Industry

During 1951 or thereabout, petitioner began working in the marine industry. Initially, he purchased two crew boats to transport workers to and from inland oil rigs. Soon after, petitioner bought an additional crew boat. He later sold the three crew boats and acquired a one-half interest in a 600-horsepower tugboat.

During 1953, petitioner and Anthony E. Orgeron formed a partnership to own and operate a 600-horsepower tugboat for use in the oil industry. Approximately 2 years later, petitioner and Mr. Orgeron built a 1,000-horsepower tugboat and another 600-horsepower tugboat. During 1958, however, petitioner and Mr. Orgeron dissolved the partnership. Upon dissolution, petitioner received three of the four vessels owned by the partnership, and Mr. Orgeron received one.

## Petitioner and Gulf Mississippi Marine Corp.

During 1958, petitioner, Vern Easterling, and Mickey Phelen formed Gulf Mississippi Marine Corp. (GMMC) to construct vessels to be used in the oil industry.[2] Petitioner, Mr. Easterling, and Mr. Phelen were equal shareholders. Three months after the incorporation, Mr. Phelen sold his one-third interest in GMMC to petitioner and Mr. Easterling. Consequently, petitioner and Mr. Easterling became 50-percent shareholders in GMMC. Later, Robert Pitre became a shareholder in GMMC as well.

Initially, GMMC only owned the three vessels that petitioner had retained from his dissolved partnership with Mr. Orgeron. By the end of 1958, GMMC owned four tugboats.

During 1969, Pott Industry, a privately held corporation based in St. Louis, Missouri, bought all of the outstanding shares of GMMC[3] and began to operate GMMC as a wholly owned subsidiary. As partial consideration for the sale of his GMMC stock to Pott Industry, petitioner received approximately 144,000 shares of Pott Industry stock which made

---

[2] GMMC operated under the name of "Gulf Fleet". During 1958, petitioner and another individual also formed Westbank Towing Co. (Westbank), which owned three tugboats. GMMC initially brokered the tugboats owned by Westbank. During 1961 or thereabout, Westbank merged into GMMC. At such time, petitioner was president and a 50-percent shareholder of GMMC. During 1963 or thereabout, petitioner and two other investors acquired Gator Supply Co. (Gator), a marine industrial supply business.

[3] At the time Pott Industry purchased GMMC, GMMC had more than 100 employees.

him one of the single largest shareholders in Pott Industry.[4] Despite the acquisition, petitioner remained president of GMMC and received additional Pott Industry stock as compensation for his services as president.

By 1974, under petitioner's leadership, GMMC had expanded and owned approximately 60 vessels (including tugboats, cargo boats, and barges) which were used in the oil industry throughout the world.[5] As a result of serving as president of GMMC, petitioner established himself as an experienced, well-connected, and well-respected member of the marine industry. GMMC's success was also quite lucrative for petitioner.

During petitioner's tenure as president of GMMC and while he was still married to Ruth Autin, he met Agnes Cherie Russo (Cherie Autin). On September 4, 1975, petitioner and Ruth Autin were divorced. On December 31, 1975, petitioner married Cherie Autin.

*Petitioner and Louisiana International Marine, Inc.*

On July 21, 1974, petitioner resigned from his positions at Pott Industry[6] and GMMC. Petitioner left these positions because he wanted to help his son become involved in business.[7] In 1974, petitioner's son was approximately 24 years old and inexperienced in the field of marine brokerage. Although petitioner's son did graduate from West Jefferson High School during May 1968, he never received a college degree, as he attended Nicholls State University in Thibodaux, Louisiana, only until 1970. The only work experience that petitioner's son had was his experience as a part-time volunteer at some of petitioner's other businesses, such as GMMC.

Petitioner wanted to help his son become more productive and wanted him "to be something in this life". Petitioner's desire to assist his son was the main reason for leaving GMMC and Pott Industry. During the summer of 1974, petitioner set out to start a new business and form a corporation

---

[4] While petitioner may have been one of the largest single shareholders in Pott Industry, his ownership was always less than 50 percent.

[5] GMMC had vessels in the Persian Gulf, in the Arabian Gulf, along the Brazilian coastline, in the Gulf of Mexico, and in the North Sea.

[6] The record does not indicate which position or positions petitioner held at Pott Industry.

[7] Petitioner could not have provided his son with a paid position at GMMC because of GMMC's antinepotism policy.

to carry on the business. On August 14, 1974, petitioner and his son incorporated Louisiana International Marine, Inc. (LIM), by executing the articles of incorporation and initial report. Petitioner and his son were the only two incorporators. To date, petitioner and his son have been the only directors of LIM.

LIM was incorporated as a brokerage for the rental of tug-boats to move offshore drilling barges. LIM primarily serves the Gulf of Mexico, utilizing equipment owned by others on a commission basis. LIM also owns vessels for rental pur-poses, but at the time LIM was incorporated, it did not own any vessels.

On August 14, 1974, two stock certificates representing 100 shares of no-par-value common stock in LIM were issued. Petitioner was issued certificate No. 1 for 51 shares (the 51 shares) of LIM stock. Petitioner's son was issued certificate No. 2 for 49 shares of LIM stock. Petitioner's son did not pro-vide any consideration for the 49 shares issued to him in 1974. There were no voting trust agreements, shareholder agreements, or other voting arrangements affecting LIM's capital stock.

Petitioner did not file a Federal gift tax return for taxable year 1974.[8]

The attorney who handled all of the legal work for the incorporation of LIM was petitioner's attorney, Robert A. Pitre, Jr. (Mr. Pitre).[9] Among the items Mr. Pitre prepared were the following: The articles of incorporation and initial report, the minutes of the first meeting of the incorporators, the minutes of the first meeting of the board of directors, and the stock certificates.

Mr. Pitre also prepared a Form 2553 to elect S corporation status for LIM. Under penalties of perjury, petitioner signed the Form 2553, which stated that petitioner was a 51-percent shareholder in LIM. LIM was an S corporation for its taxable year ended December 31, 1974. LIM, however, terminated its S corporation status during 1975, effective January 1, 1975, and remains a C corporation. In order to break its S corpora-tion election, on November 4, 1975, the stock certificate in

---

[8] Petitioner did file Federal gift tax returns for 1976 in which he reported that he gave his son an undivided one-half interest in shares of stock in Pan American World Airlines, Smith International, SEDCO, Inc., and Trans World Airlines.

[9] Robert A. Pitre, Jr., is a son of Robert Pitre, one of the original coowners of GMMC.

the name of petitioner's son (i.e., stock certificate No. 2) for 49 shares was canceled, and LIM stock certificate No. 3 was issued to petitioner's son reflecting his ownership of 48 shares. LIM stock certificate No. 4 was issued to Tracy Rials, reflecting her ownership of one share. On November 24, 1975, Ms. Rials sold her share back to petitioner's son. Stock certificate No. 3 and stock certificate No. 4 were subsequently canceled, and petitioner's son was issued stock certificate No. 5 reflecting his ownership of 49 shares.

## The Counter Letter

Mr. Pitre also prepared a document entitled "Counter Letter and Agreement to Convey" (the counter letter) for petitioner and his son to sign. On August 14, 1974, petitioner and his son executed the counter letter, which states that petitioner signed the following documents before Mr. Pitre, as notary public:

Articles of Incorporation for Louisiana International Marine, Inc., an Initial Report, Minutes of a Meeting of Incorporation, Minutes of the First Meeting of the Board of Directors, By-Laws, two (2) stock certificates and a receipt for Stock Certificate No. 1 for fifty-one (51) shares of Capital Stock of Louisiana International Marine, Inc. for the purpose of forming said Corporation so that he and his son Bobby C. Autin, could begin working together in the Marine Industry; that in accordance with all of the documents above mentioned, Claude J. Autin, appearer herein, received and is the registered owner of Certificate No. 1 representing 51 shares of the Capital Stock of Louisiana International Marine, Inc.;

The counter letter further states:

That in truth and in fact appearer has no ownership interest in said stock certificate of said capital stock of said corporation; that the same was acquired by him for the account of his son, Bobby C. Autin, and that he will execute in favor of said Bobby C. Autin, or his nominee, at such time as appearer is called upon so to do, any and all instruments and documents necessary to transfer to the said Bobby C. Autin all right, title and interest that appearer has or may have in and to Louisiana International Marine, Inc. and/or Certificate No. 1 representing 51 shares of the capital stock of said corporation.

The counter letter also states the following as the reason why the 51 shares were issued in petitioner's name:

although the corporation in truth and in fact belongs to Bobby C. Autin, and appearer will be employed as president of the corporation, it will be

to the best interest of the corporation, and his son that the clients and customers of said corporation believe appearer to be the principal stockholder of Louisiana International Marine, Inc. because of appearer's reputation in the Marine industry and because of the personal contacts and relationships established over the years between appearer and these customers.

## Petitioner's Role at LIM

During his many years in the marine industry, petitioner had developed a long list of business contacts. As a result of his excellent reputation, petitioner was able to attract highly qualified individuals to work at LIM, was able to secure the appropriate vessels for LIM's operations, and also guaranteed loans so that LIM could properly begin its business. Petitioner was the first president, secretary, and treasurer of LIM. As president, his vital function was in the sales component of the business. Petitioner was in charge of recruiting customers and making sure that the customers were satisfied so they would continue to do business with LIM. Petitioner would spend 2 to 4 days per week traveling to "drum up business". Petitioner also made all of the financial decisions at LIM.

As a result of petitioner's expertise and leadership abilities, LIM became a very reputable and lucrative member of the marine industry.

## Robert B. Thompson's Role at LIM

During 1974, petitioner hired Robert B. Thompson (Mr. Thompson) for the position of LIM's vice president in charge of operations.[10] Mr. Thompson was formerly associated with Tidewater Marine Service, a competitor of petitioner's located in the Yukon Territory. As vice president of operations, Mr. Thompson handled the construction and maintenance of vessels, the purchasing of equipment, and the supervision of the crew. He made pricing decisions and would occasionally handle sales. Mr. Thompson did not make any financial decisions other than choosing which materials to purchase for the vessels. Finally, Mr. Thompson was the person who trained petitioner's son in the operations aspect of LIM's business.

---

[10] Mr. Thompson continues to serve LIM in the same capacity today.

*The Role of Petitioner's Son at LIM*

When LIM was first incorporated, petitioner's son was elected vice president. He worked mainly in operations, working long hours as he tried to learn about the marine industry by working at Mr. Thompson's side. He served LIM in that capacity until June 1988 when he replaced petitioner as president. When petitioner's son became president, petitioner became vice president, but petitioner retained his positions as secretary and treasurer, which he still holds.

*LIM's Accounting and Returns*

For taxable year 1974, LIM filed a Form 1120S and reported taxable income of $251,951.56. LIM issued Schedules K-1 to both petitioner and his son for the 1974 taxable year. On their respective 1974 income tax returns, petitioner and his son reported $128,495.30 (or 51 percent) and $123,456.26 (or 49 percent) of LIM's undistributed taxable income, respectively. Such amounts were distributed to petitioner and his son in 1975. Petitioner had not informed LIM's return preparer of the existence of the counter letter when the Schedules K-1 were issued.

During February 1976, A.A. Harmon & Co., Certified Public Accountants (A.A. Harmon), was hired to audit LIM's books for taxable year 1975. Henry Silvia was the audit supervisor, and Mark Munson was the accountant for the audit.

Mr. Silvia met with petitioner to complete an audited financial statement. Mr. Silvia was also responsible for gathering information so that the tax department of A.A. Harmon could complete LIM's corporate tax returns for taxable year 1975.

During the course of the audit, Mr. Silvia and Mr. Munson discovered that no value had been allocated to the capital stock issued to petitioner and his son when LIM was incorporated and that there were no cash receipts or disbursements journals for LIM for taxable year 1974. Petitioner's and his son's salaries as officers of LIM, however, were shown in accounts with credit balances.

Mr. Munson made an adjusting journal entry showing $100,000[11] as the value of the capital stock of LIM that had been issued to petitioner and petitioner's son. Mr. Munson then lowered petitioner's salary by $51,000 and petitioner's son's salary by $49,000. After reviewing the audit and after having several client discussions, Mr. Silvia adjusted the assigned value of the capital stock downward to $10,000 with corresponding adjustments of $5,100 to petitioner's account and $4,900 to the account of petitioner's son.

Mr. Silvia also wanted to know if petitioner and petitioner's son had decided on the disposition of the stock in the event of the death of either of them. Mr. Silvia usually recommended a stock redemption plan to maintain continuity in the management of the company. During a 1976 discussion with petitioner regarding a stock redemption plan, petitioner first mentioned the existence of the counter letter to Mr. Silvia.[12] Upon hearing of the counter letter, Mr. Silvia was no longer concerned about a redemption plan. Additionally, Mr. Silvia did not consider any gift tax implications to petitioner and did not mention the existence of the counter letter to anyone at A.A. Harmon because he believed the counter letter to be a private agreement between petitioner and his son.

On LIM's Federal income tax returns for taxable years 1974 through 1987, petitioner is shown as the owner of 51 percent of the stock, and petitioner's son is shown to be the owner of either 49 percent or 48 percent.[13] Such returns were to be signed under penalties of perjury.[14] LIM's Louisiana income tax returns similarly reported that petitioner owned 51 percent of the voting stock of LIM for taxable years 1975 through 1987.

During 1980, Mr. Silvia left A.A. Harmon, and the LIM account was assigned to Mr. Munson. Mr. Munson first learned of the counter letter during 1983 when he had a meeting with petitioner and a tax partner at A.A. Harmon. Mr. Munson saw a copy of the counter letter during such meeting. Mr. Munson did not instruct petitioner to file a gift

---

[11] Mr. Munson chose the $100,000 figure because it was a "nice, round figure".

[12] Mr. Silvia never actually saw the counter letter.

[13] We note that LIM's Federal income tax return for taxable year 1984 does not include the percentage of LIM stock owned by petitioner or the percentage owned by his son.

[14] The record contains photocopies of all of the returns, some of which were signed before they were photocopied and others which were photocopied before they were signed.

tax return when he learned about the counter letter and did not forward the information about the counter letter to A.A. Harmon's tax department.

## Petitioner's Divorce From Cherie Autin

Petitioner and Cherie Autin were divorced on January 8, 1986. In a community property settlement document executed on January 8, 1986, petitioner agreed to pay Cherie Autin $1 million (as well as convey certain jewelry and clothing) in consideration of Cherie Autin's release of any claims she may have had with respect to certain specified property. After listing the specified property, the community property agreement specifically provided:

> It is further agreed and stipulated by both parties that the stock in Louisiana International Marine, Inc. is wholly owed by Bobby C. Autin. Agnes Russo Autin [Cherie Autin] agrees that as additional consideration for the One Million and NO/100 ($1,000,000) Dollars hereinabove mentioned, she waives any rights she feels she may have to contest the ownership of said stock and specifically waives any rights she feels she may have to assert a claim that the stock in Louisiana International Marine, Inc. is an asset of the community.

On February 18, 1987, Cherie Autin brought a petition to set aside the community property settlement in Louisiana State court. Cherie Autin attacked the validity of the counter letter as one of her reasons to set aside the agreement. The Twenty-Fourth Judicial District Court for the Parish of Jefferson upheld the validity of the counter letter, finding that the counter letter effectively renounced any ownership interest of petitioner in LIM.[15]

## The Change of Ownership of the 51 Shares

During 1988, petitioner decided to record the ownership of the 51 shares in his son's name because petitioner was ready to retire from LIM. Petitioner contacted Mr. Munson to notify him of his plans to change the record ownership of the 51 shares to his son. Petitioner asked Mr. Munson if he foresaw any problems. Mr. Munson did not advise petitioner that there would be any gift tax consequences arising out of such change in record ownership of the 51 shares.

---

[15] Although Cherie Autin filed an appeal, she did not question the trial court's judgment on the issue of the validity of the counter letter.

On June 10, 1988, the record ownership of the 51 shares was changed from petitioner to his son. Petitioner's certificate No. 1 and his son's stock certificate No. 5 were canceled, and certificate No. 6 was issued in the name of petitioner's son reflecting ownership of 100 shares. No consideration passed between petitioner and his son as a part of such transaction. No gift tax return was filed by petitioner for taxable year 1988. LIM's Federal and Louisiana State income tax returns for the 1988 taxable year reported that petitioner's son owned 100 percent of LIM's stock.

Respondent determined that petitioner transferred the 51 shares to his son in June of 1988 and determined a gift tax deficiency in the amount of $1,649,736 against petitioner. Respondent also determined that petitioner lacked reasonable cause for his failure to file a gift tax return for taxable year 1988 and determined that he was liable for an addition to tax under section 6651(a) in the amount of $412,434.

## OPINION

The first issue for decision is whether the change of record ownership of the 51 shares from petitioner to his son during June 1988 was a transfer of property that constituted a taxable gift at that time. Section 2501 imposes a tax on the "transfer of property by gift". Section 2511(a) provides that the gift tax applies "whether the transfer is in trust or otherwise, whether the gift is direct or indirect, and whether the property is real or personal, tangible or intangible".

Congress, however, did not intend to tax gifts before the donor has fully parted with his interest in the property purportedly transferred. *Estate of Sanford v. Commissioner*, 308 U.S. 39, 43 (1939). Accordingly, a transfer of property is only considered to have been completed for Federal gift tax purposes to the extent that "the donor has so parted with dominion and control as to leave him no power to change its disposition, whether for his benefit or for the benefit of another". Sec. 25.2511–2(b), Gift Tax Regs. Consequently, a gift is not complete if the donor retains a substantial legal right or economic benefit in the transferred property. *Smith v. Shaughnessy*, 318 U.S. 176 (1943); *Estate of Sanford v. Commissioner, supra* at 43; *Burnet v. Guggenheim*, 288 U.S. 280 (1933). To evaluate whether a gift has been completed,

we look to the "objective facts of the transfer and the circumstances under which it [the gift] is made". Sec. 25.2511–1(g)(1), Gift Tax Regs. Petitioner bears the burden of proof. Rule 142(a).

Petitioner contends that no gift was made during June 1988 because he was not the owner of the 51 shares at the time the record ownership of the 51 shares was changed to his son. Petitioner argues that, under Louisiana law, petitioner's son was the equitable owner of the 51 shares pursuant to the counter letter. Petitioner alternatively contends that, even if petitioner had acquired an equitable interest in the 51 shares during 1974, he effectively transferred the 51 shares when he executed the counter letter. In any event, petitioner maintains that this Court must recognize the validity of the counter letter based on the holding of the Louisiana State trial court. Petitioner further contends that an inter vivos transfer occurred during 1974 under the Louisiana Uniform Stock Transfer Act.

Respondent, on the other hand, contends that, under Louisiana law, the counter letter is not binding on third persons, such as respondent, who had no notice of the counter letter's existence. Respondent also contends that, despite the counter letter, which purports to assign ownership in the 51 shares to petitioner's son, petitioner did not relinquish dominion and control over the shares until 1988, and that the completion of the gift of the 51 shares did not occur until the 51 shares were registered in the name of petitioner's son during 1988.

The facts of the instant case, however, are quite similar to the estate tax setting in which a taxpayer makes an "outright" transfer of property to his child, but the taxpayer continues to earn income or use the property until death. In *Estate of Sanford v. Commissioner, supra* at 43, the Supreme Court stated that there is nothing in the gift tax laws or in the legislative history of the gift tax laws to suggest that

the test of the completeness of the taxed gift was to be any different from that to be applied in determining whether the donor has retained an interest such that it becomes subject to the estate tax upon its extinguishment at death. * * * The two [the estate tax and the gift tax] are in *pari materia* and must be construed together. * * * [*Id.* at 44 (citing *Burnet v. Guggenheim, supra* at 286).]

Consequently, we look to Federal estate tax cases for guidance in deciding the issue of whether a gift is complete for Federal gift tax purposes. See *Robinson v. Commissioner*, 675 F.2d 774, 779 n.13 (5th Cir. 1982), affg. 75 T.C. 346 (1980).

In the estate tax setting, the Commissioner seeks to include the transferred property in the decedent's gross estate, based on the decedent's continued use and enjoyment of the property. Various courts have found that the actual possession or enjoyment of the property gives rise to the inference of an understanding or agreement between the decedent and the transferee that the gift is not complete until some later time. The existence of such an understanding supports a finding that the decedent retained control over the property regardless of whether State law recognizes a completed transfer of ownership. See *Estate of Whitt v. Commissioner*, 751 F.2d 1548, 1558–1559 (11th Cir. 1985), affg. T.C. Memo. 1983–262; *Estate of McNichol v. Commissioner*, 265 F.2d 667, 670 (3d Cir. 1959), affg. 29 T.C. 1179 (1958); *Tubbs v. United States*, 348 F. Supp. 1404 (N.D. Tex. 1972), affd. 472 F.2d 166 (5th Cir. 1973); *Estate of Nicol v. Commissioner*, 56 T.C. 179, 181–184 (1971).

In *Estate of McNichol v. Commissioner, supra,* the decedent purported to transfer income-producing real estate to his children almost 10 years before he died. Subsequent to the conveyance, the decedent continued to receive the rents from the real estate on account of an understanding with his children. The Commissioner determined that the real estate was to be included in the decedent's gross estate. We held that the property was includable in the decedent's gross estate under section 811(c)(1)(B)[16] of the Internal Revenue Code of 1939. 29 T.C. 1179 (1958). The children unsuccessfully argued that, under Pennsylvania law, the children had received fee simple title to the real estate, that the Pennsylvania Statute of Frauds prevented the decedent from enforcing an oral agreement against his children, and that the decedent had retained no right to the income. *Estate of*

---

[16] Sec. 811(c)(1)(B), I.R.C. 1939, was the precursor to sec. 2036, which includes in a decedent's gross estate the value of all property of which a decedent at any time has made a transfer (that was not a sale for adequate and full consideration in money or money's worth) under which the decedent has retained possession or enjoyment of, or the right to income from, the property for the decedent's life.

*McNichol v. Commissioner*, 265 F.2d at 669. The Court of Appeals for the Third Circuit stated as follows:

> It is not necessary for us to delve into Pennsylvania law, for the question is not one of local law. Rather, it is whether Congress intended that section 811(c)(1)(B) should subject to an estate tax property conveyed under circumstances which here prevail. While state law creates legal interests and rights, it is the federal law which designates which of these interests and rights shall be taxed. [*Id.* at 670; citations omitted.]

The Court of Appeals then analyzed the history of section 811(c)(1)(B) as well as the cases interpreting the section and concluded that under Federal law the property was includable in the decedent's gross estate because the decedent had in effect retained possession and enjoyment of the property until he died. *Id.* at 671.

Similarly, in the instant case, we hold that Louisiana law does not control the issue of whether the transfer of the 51 shares is subject to Federal gift tax. Consequently, although both parties argue extensively over the eccentricities of Louisiana law with respect to the efficacy of the counter letter, we decline to decide the instant case on that basis. Although Louisiana law may recognize that equitable title of the 51 shares passed from petitioner to his son in 1974, we rely on Federal law to decide whether such transfer was complete for Federal gift tax purposes. *United States v. Irvine*, 511 U.S. ____, 114 S. Ct. 1473, 1481–1482 (1994); *Helvering v. Stuart*, 317 U.S. 154, 162 (1942); *Morgan v. Commissioner*, 309 U.S. 78, 80–81 (1940); *Estate of McNichol v. Commissioner, supra.*

It is well established that, for Federal tax purposes, the substance of the transaction, rather than the form in which the transaction is cast, governs its tax consequences. *Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260, 265–267 (1958); *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945); *Higgins v. Smith*, 308 U.S. 473 (1940); *Griffiths v. Commissioner*, 308 U.S. 355 (1939); *Minnesota Tea Co. v. Helvering*, 302 U.S. 609 (1938); *Gregory v. Helvering*, 293 U.S. 465 (1935). In the context of a gift tax case, we look to see whether the transferor, in substance, parted with dominion and control over the purportedly transferred property. *Estate of Sanford v. Commissioner, supra* at 43; *Robinson v. Commissioner, supra*; sec. 25.2511–2(b), Gift Tax Regs.

Petitioner contends that his son was the true owner of the 51 shares as of August 14, 1974, the date of the counter letter, and that petitioner was "merely" holding the 51 shares in his own name on his son's account. Based on the record in the instant case, we conclude that petitioner substantively retained ownership through his exercise of dominion and control over the 51 shares. Although petitioner asserts that he was acting as a mere nominal owner of the 51 shares so that customers and other members of the marine industry would be encouraged to conduct business with LIM, petitioner's actions indicate otherwise.

Respondent contends that the following factors indicate petitioner's dominion and control over, and substantive ownership of, the 51 shares: (1) Petitioner held himself out as a 51-percent shareholder on LIM's Federal and State corporate income tax returns; (2) petitioner signed corporate tax returns under penalties of perjury;[17] (3) petitioner reported 51 percent of all of LIM's undistributed taxable income on his Form 1040 for taxable year 1974 when LIM was an S corporation; (4) during 1974, LIM reported to the Internal Revenue Service that petitioner was a 51-percent shareholder in LIM; (5) to break the subchapter S election, the 49 shares held by petitioner's son were reduced to 48, rather than reducing petitioner's shares from 51 to 50; (6) once LIM became a C corporation, LIM's corporate minutes reflect that petitioner attended the shareholders meetings and exercised his voting rights as to the 51 shares; (7) petitioner was in charge of LIM from the time of LIM's incorporation until June 1988 when he resigned as president (in favor of his son's becoming president) and became vice president; (8) petitioner traveled 2 to 4 days per week to meet with potential customers to sell LIM's services; (9) petitioner was the guiding force who set up LIM's business and successfully managed it until his son gained the experience necessary to successfully run LIM; (10) petitioner personally guaranteed several of LIM's loans during early years; (11) petitioner had the authority to invest LIM's capital; (12) as part of their community property settlement,

---

[17] While all of the corporate tax returns were required to be signed under penalties of perjury, the record does not include signed copies for all taxable years from 1974 through 1988. Petitioner does not dispute that all of LIM's corporate tax returns were signed by himself (or on a few occasions by his son) before the returns were submitted to the IRS or the Louisiana taxing authorities.

petitioner paid Cherie Autin to waive her rights and claims to petitioner's interest in LIM; and (13) throughout the years, petitioner's auditors and attorneys who knew of the counter letter apparently treated the counter letter as a secret document that had an effect only between petitioner and his son.[18]

We agree with respondent that petitioner's actions indicate his extensive assertion of dominion and control over LIM and petitioner's substantive ownership of the 51 shares. Significantly, petitioner held himself out as the majority shareholder to all of LIM's customers and business associates and acted as the true owner of the 51 shares. He held himself out to the Internal Revenue Service as well as the Louisiana taxing authorities as a 51-percent owner. Petitioner reported 51 percent of LIM's undistributed taxable income on his Form 1040 for taxable year 1974.[19] He attended shareholders meetings and exercised his voting rights with respect to the 51 shares. Petitioner controlled LIM as president from August 1974 through June 1988. At the same time that petitioner relinquished the presidency of LIM, he transferred ' .e 51 shares into his son's name. Indeed, petitioner transferred the shares to his son during 1988, not because his son demanded them, but because petitioner decided that he wanted to retire from LIM.

There is nothing in the record indicating that petitioner's son, who purportedly owned 100 percent of LIM pursuant to the counter letter, had acted as the sole shareholder. There were no voting trust agreements or shareholder agreements to document that petitioner was required to vote the 51 shares as a fiduciary on behalf of his son or in the same manner that his son voted his shares. Moreover, petitioner's son did not testify as to his control over the 51 shares or his understanding with petitioner as to the ownership of the 51 shares. "The rule is well settled that failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable." *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

---

[18] We note that respondent did not plead estoppel in the instant case. Because respondent has not raised such argument, we do not discuss estoppel.

[19] There is nothing in the record to indicate that petitioner's son paid these taxes.

Based on the record in the instant case, we hold that, for Federal gift tax purposes, petitioner has not shown that he completely relinquished ownership, dominion, and control of the 51 shares prior to June of 1988, when record ownership of the 51 shares was transferred to his son. We have considered all of petitioner's remaining arguments and find them to be without merit. Accordingly, we hold that petitioner's transfer of the 51 shares to his son during 1988 constitutes a taxable gift in that year.[20]

The remaining issue for decision is whether petitioner is liable for an addition to tax under section 6651(a) for failure to file a gift tax return. In the case of a taxpayer who fails to file a required tax return, section 6651(a) provides for an addition to tax, unless the taxpayer can demonstrate that the failure to file was due to reasonable cause and not due to willful neglect. Sec. 6651(a)(1). Although reasonable cause is not defined in the Code, the regulations state: "If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to reasonable cause." Sec. 301.6651–1(c)(1), Proced. & Admin. Regs. Willful neglect has been defined as a "conscious, intentional failure or reckless indifference." *United States v. Boyle*, 469 U.S. 241, 245 (1985).

Petitioner did not file a Federal gift tax return for taxable year 1988. Consequently, we must decide whether petitioner's failure to file a return was due to "reasonable cause" and not due to "willful neglect". The questions of "reasonable cause" and "willful neglect" are questions of fact, and petitioner has the burden of proof. Rule 142(a); *Lee v. Commissioner*, 227 F.2d 181, 184 (5th Cir. 1955), affg. a Memorandum Opinion of this Court.

Petitioner contends that he did not file a gift tax return for taxable year 1988 because he relied on the professional advice of his accountants and attorneys, who counseled him that no gift had been made for gift tax purposes during 1988.

---

[20] Petitioner filed a motion in limine to prevent the deposition of Donald A. Thibodeaux from being introduced into evidence by respondent. Petitioner also seeks to exclude selected pages from the treatise A Basic Louisiana Notary Guide, by James O. Johnson, that respondent attempted to offer into evidence. Because we hold for respondent without considering such evidence, we hold that the question of whether such evidence should be admitted is moot.

Respondent contends that petitioner's reliance on his attorneys and accountants was not reasonable.

The Supreme Court noted in *United States v. Boyle, supra* at 251, that a taxpayer may establish reasonable cause for failure to file a return if he shows that he reasonably relied on the advice of a competent professional even if the advice turns out to be erroneous. Petitioner's failure to file a gift tax return for taxable year 1988 was based on the advice of his professional advisers, who maintained that no gift tax consequences arose during 1988 on account of the 1974 counter letter. We find that petitioner's reliance on his advisers was reasonable and hold that his failure to file a gift tax return for taxable year 1988 was due to reasonable cause and not due to willful neglect. Accordingly, we hold that petitioner is not liable for the addition to tax under section 6651(a)(1) for taxable year 1988.

To reflect the foregoing,

*An appropriate order will be issued.*