T.C. Memo. 1998-64


UNITED STATES TAX COURT


REED SMITH SHAW & MCCLAY, WILLIAM J. SMITH,
TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 14392-93.      Filed February 17, 1998.


William Joseph Smith, pro se.

Michael A. Yost, Jr., for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, Judge:  This is an action brought by the tax matters partner of the above-captioned partnership for readjustment of partnership items.  It involves a notice of final partnership administrative adjustment (notice of FPAA) in which respondent disallowed a deduction of $16,500

that was claimed on the partnership's 1986 return. The amount of the deduction is the value of certain stock that the partnership allegedly contributed to a defined benefit plan for the benefit of one of its partners. The sole issue for decision is whether the partnership is deemed to have "paid" the alleged contribution of stock to the defined benefit plan on the last day of 1986, as provided by section 404(a)(6), with the result that it is entitled to deduct the value of the stock on its 1986 return under section 404(a)(1). Unless stated otherwise, all section references are to the Internal Revenue Code as in effect during the year in issue.

FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the instant petition was filed, the principal place of business of the partnership, Reed Smith Shaw & McClay, was located in Pittsburgh, Pennsylvania, and the tax matters partner worked and resided there. The partnership reported income and expenses on a calendar year basis and used the cash receipts and disbursements method of accounting.

Defined Benefit Pension Plan

On November 15, 1984, the partnership established a defined benefit pension plan for one of its partners, Mr. Arland T. Stein, who was the sole participant of the plan. The plan was designated the RSSM/ATS Defined Benefit Pension Plan #25-0749630/125 (the plan). It became effective on January 1, 1984, and was amended on January 1, 1985. The plan and the trust that formed a part thereof, as described below, constituted a qualified pension plan within the meaning of section 401(a), and the trust was tax-exempt under section 501(a).

The general administration of the plan and the responsibility for carrying out its provisions were placed in the hands of a "committee". The plan document provides that the committee is to be appointed by the partnership and "shall consist of, or include, the individual named on the cover page of the Plan"; viz, Mr. Stein, the sole participant. There is no evidence that the partnership appointed any other person to be a member of the committee.

The plan document designates the committee as the "plan administrator" within the meaning of section 3(16)(A) of the Employee Retirement Income Security Act of 1974, Pub. L. 93-406, 88 Stat. 835. Accordingly, the committee

was responsible for the day-to-day administration of the plan, such as engaging an actuary to specify the amount of contributions required to satisfy the minimum funding standard of section 412 and the maximum contributions deductible under section 404(a). The committee was also authorized to appoint one or more investment managers and was responsible for the determination of benefits due under the plan. The plan document provides that its terms should be construed in accordance with the laws of the Commonwealth of Pennsylvania. Article VI of the plan document gives Mr. Stein's wife, Mrs. Helen M. Stein, the right to receive Mr. Stein's benefits in the event of his death.

Article VIII, section 8.2 of the plan document sets forth a disclaimer of the partnership's liability to make contributions to the plan which states as follows:

> Although it is the intention of the Firm [i.e., the partnership] that the Plan shall be continued and that contributions hereunder shall be made as provided in Section 8.1 above, the Plan is entirely voluntary on the part of the Firm and its continuance and the payment of contributions hereunder are not assumed as contractual obligations of the Firm, and the Plan shall have no cause of action against the Firm. The Firm does not guarantee or promise to pay or cause to be paid any of the benefits provided by the Plan. * * * The Firm specifically reserves the right, in its sole and absolute discretion, to modify,

suspend, in whole or in part, at any time, or from time to time, and for any period or periods of time, or to discontinue, at any time, the contributions described in Section 8.1 hereof, provided such act is not in derogation of any law or laws which at such time are applicable to legal and enforceable rights of this Plan. The fact that the Firm becomes subject to any tax or penalty by having failed to make a contribution shall not give rights under or to this Plan to require contributions.

## Trust Agreement for the Plan

On November 15, 1984, the managing partner of the partnership also established a trust as part of the plan by executing the Trust Agreement For the RSSM/ATS Defined Benefit Pension Plan (the trust agreement). Mr. Stein is designated therein as the sole trustee of the trust, and he executed the trust agreement in that capacity. The trust agreement provides that the trust is to be construed, administered, and enforced, to the extent not preempted by applicable Federal law, in accordance with the laws of the Commonwealth of Pennsylvania.

The trustee's powers included the power to retain, purchase, sell, convey, or transfer property, and to vote either in person or by proxy any stocks, bonds, or other securities held in the fund. One of the powers given to the trustee under the trust agreement is the power:

to cause any investment in the Fund to be registered in, or transferred into, the Trustee's name or the name of a nominee or nominees or to retain any such investment unregistered or in form permitting transfer by delivery, provided that the books and records of the Trustee shall at all times show that all such investments are part of the Fund;

In section 8.1, Article VIII, the trust agreement imposes the following record keeping and reporting requirements on the trustee:

8.1  The Trustee shall keep a record of all his proceedings and acts with respect to the Plan, and shall keep all such books of account, records, and other data as may be reasonably necessary for the proper administration of the Plan.  In compliance with the applicable laws, the Trustee or his agents shall furnish the Company [i.e., the partnership] and each Participant covered under the Plan and each beneficiary who is receiving benefits under the Plan and to every other person required by law to be so informed such information as may be required of the Trustee by any applicable law or regulation.  Within one hundred twenty (120) days following the close of each fiscal year of the Fund or following the close of such other period as may be agreed upon between the Trustee and the Company, and within ninety (90) days or such other agreed upon period unless such period be waived after the removal or resignation of the Trustee as provided for in Section 10.1 hereof, the Trustee shall file with the Company a certified written report setting forth all investments, receipts and disbursements, and other transactions effected during such fiscal year or other annual period or during the period from the close of the preceding fiscal year or other preceding period to the date of such removal or resignation, including a description

of all securities and investment purchases and sales with the cost or net proceeds of such purchases or sales and showing all cash, securities and other property held at the close of such fiscal year or other period, valued currently as provided in Section 9.1, and such other information as may be required of the Trustee under any applicable law.  Upon the expiration of ninety (90) days from the date of filing such annual or other account, the Trustee shall, to the extent permitted by law, be released and discharged from any liability or accountability to anyone as respects the propriety of its acts or transactions.  The Committee or Company shall have the right to demand or be entitled to any further or different accounting by the Trustee, but no participant or beneficiary or any other person shall have the right to demand or be entitled to any accounting by the Trustee, other than those to which they may be entitled under the law.  Nothing contained herein will be construed or interpreted to deny the Trustee the right to have his account judicially determined.

The record of this case contains no books of account, records, or other data that were prepared by or on behalf of the trustee or maintained by the trustee as a record of his proceedings and acts with respect to the plan.

The trust agreement requires the trustee to make an annual valuation of the assets held on behalf of the plan and to report that value to the partnership and the committee in accordance with paragraph 8.1, Article VIII, quoted above.  The record of this case does not contain any such valuation of plan assets.

The Steins' Broadcort Account

Mr. Stein and his wife opened a brokerage account with Broadcort Capital Corp. (Broadcort) sometime in January 1987. The account was in the name of Mr. Stein and his wife as joint tenants with rights of survivorship. Steinberg & Lyman, a New York brokerage firm, acted as agents of Broadcort, and Mr. Stein dealt with a vice president of Steinberg & Lyman, Mr. Charles Tessarini, and his assistant Ms. Janice Murphy. The Steins received monthly statements of transactions in their account about 2 to 3 weeks after the close of each accounting period.

The statement for the period beginning March 28, 1987, and ending April 24, 1987, reports that on April 15, 1987, 4,000 shares of stock of Saztec International, Inc. (Saztec), were sold for $31,998 or $8 per share, and on April 23, 1987, another 500 shares of Saztec stock were sold for $3,973 or $8 per share. Saztec was publicly traded on the NASDAQ. As of April 25, 1987, 5,500 shares of Saztec stock remained in the Steins' account. The statement also reports the purchase on April 1, 1987, of 4,000 shares of Texcel International, Inc. (Texcel) stock for $32,502 or $8.125 per share, and it reports the

purchase on April 2, 1987, of 500 shares of UTS Total Resh Corp. (UTS) for $2,500 or $5 per share.

## Alleged Assignment of Saztec Stock to the Plan

On April 7, 1987, Mr. Stein executed a document entitled Reimbursement And Contribution Agreement For the RSSM/ATS Defined Benefit Pension Plan (the contribution agreement), which provides as follows:

> I, Arland T. Stein, do hereby assign and transfer to Reed Smith Shaw & McClay, as of April 6, 1987, two thousand (2000) shares of Sactec [sic] International Common, the same being free and clear of any and all encumbrances, in full and complete satisfaction of any and all obligations that I have under agreements to reimburse Reed Smith Shaw & McClay for any amounts that Reed Smith Shaw & McClay becomes liable, whether directly or indirectly, to contribute to any defined benefit pension plan under which I am accruing benefits.

> Reed Smith Shaw & McClay does hereby accept the assignment of two thousand (2000) shares of Sactec [sic] International Common in complete satisfaction of Arland T. Stein's obligations to make whole Reed Smith Shaw & McClay for any and all amounts for which Reed Smith Shaw & McClay may be obligated to contribute to any defined benefit pension plan under which Arland T. Stein is covered and is accruing benefits. Further, Reed Smith Shaw & McClay does hereby assign and transfer, in full and complete satisfaction of any and all of its obligations and requirements, whether arising directly or indirectly, under either law or agreement, to make contributions to the RSSM/ATS Defined Benefit Pension Plan. Such assignment and transfer is to be effective as of April 6, 1987, and such contribution shall be the

full contribution for the calendar year ending December 31, 1986. The Trustee of the RSSM/ATS Defined Benefit Pension Plan has acknowledged receipt of such assignment and transfer of the 2000 shares of Sactec [sic] International Common by his signature affixed hereto.

Arland T. Stein, Reed Smith Shaw & McClay, and the Trustee of the RSSM/ATS Defined Benefit Pension Plan agree and concur that the per share value of such Sactec [sic] International Common stock on April 4, 1986, was $8.25, and that therefore the full value of all assignments and transfers herein described is equal to $16,500.

On the same date, Mrs. Helen Stein ratified Mr. Stein's alleged assignment and transfer to the partnership of 2,000 shares of Saztec stock by executing a document entitled Ratification and Assignment (ratification). The ratification provides as follows:

I, Helen M. Stein, do hereby release and ratify the assignment and transfer to Reed Smith Shaw & McClay, as of April 6, 1987, of Two Thousand (2,000) shares of Saztec International, common, and do hereby release and assign any residual right that may remain to me to Reed Smith Shaw & McClay in fee and in accordance with the assignment and transfer of my husband, Arland T. Stein.

The value of 2,000 shares of Saztec stock on April 4, 1987, was $16,500 or $8.25 per share, the value assigned to the stock by the contribution agreement.

The contribution agreement and ratification do not identify any specific shares of Saztec stock, such as by CUSIP number, location, or in any other manner. As mentioned above, the brokerage statement for the Steins' Broadcort account for the period ending April 24, 1987, shows that there were 10,000 shares of Saztec stock held in the Stein's Broadcort account on April 7, 1987, and 5,500 shares in the account on April 25, 1987.

Mr. Stein did not maintain an account with Broadcort in his capacity as trustee of the trust. Mr. Stein maintained an account with Drexel Burnham Lambert in his name as trustee of the trust. The partnership did not have an account with Broadcort.

Mr. Stein did not send written instructions to Broadcort or its agent, Steinberg & Lyman, informing Broadcort of the assignment of 2,000 of the 10,000 shares of Saztec stock in the Steins' personal account to the pension trust or asking that a separate account be established in the name of the trust and that 2,000 shares of Saztec stock be transferred from the Steins' personal account to that separate account for the trust. Neither Broadcort, Steinberg & Lyman, nor any of their employees issued an acknowledgment or written confirmation to

Mr. Stein, the partnership, or the trust that 2,000 shares of Saztec stock had been or would be transferred from the Steins' personal account to the trust.

The Steins' Lawsuit for Unauthorized Trading

Three or four months after the execution of the contribution agreement, the Steins came to believe that Steinberg & Lyman or Broadcort or both were trading stocks in their Broadcort account without their authorization. In 1988, the Steins filed a lawsuit in the U.S. District Court for the Western District of Pennsylvania against Broadcort, Steinberg & Lyman, Mr. Tassinari, Ms. Janice Murphy, and others. The complaint and amended complaint allege unauthorized trading, breach of agency, breach of implied contract, breach of fiduciary duty, fraud and deceit, violation of the Pennsylvania Securities Act, and negligence. The alleged unauthorized trading involved shares of stock of a company, Criticare Systems, Inc., for which Steinberg & Lyman allegedly was the underwriter and market maker. It did not involve shares of Saztec stock. The complaint and amended complaint allege that the following unauthorized trades, involving the shares of Criticare Systems, Inc., had taken place:

| Date | Trans. | Number of Shares | Price Per Share | Cost | Proceeds |
|------|--------|------------------|-----------------|------|----------|
| 7/29/87 | Sale | 95 | $6.25 | -- | $595.75 |
| 9/16/87 | Purchase | 5,000 | 9.00 | $45,000 | -- |
| 9/30/87 | Purchase | 5,000 | 10.25 | 51,252 | -- |
| 11/05/87 | Purchase | 5,000 | 10.25 | 51,252 | -- |
| 11/20/87 | Sale | 9,000 | 4.375 | -- | 39,364.00 |

The Steins brought the above suit in their individual capacities.  The trust was not a party to the suit, and no mention is made therein of Broadcort's or Steinberg & Lyman's alleged failure to transfer the 2,000 shares of Saztec stock to the trust.

Before filing suit, the Steins entered into a "standstill" agreement with Broadcort and/or Steinberg & Lyman which purportedly prohibited Broadcort and its agents from selling the stocks in the Steins' account.  The standstill agreement is not contained in the record of this case.  Apparently, the standstill agreement covered all of the stock in the Steins' Broadcort account, including the 2,000 shares of Saztec stock that Mr. Stein had allegedly transferred to the trust.  There is no evidence that the trust was a party to this agreement.  The standstill agreement was backed by a letter of credit in the amount of $150,000 that Mr. Stein obtained on September 30, 1988,

from Pittsburgh National Bank.  The letter of credit was secured by a mortgage on the Steins' home.

The Steins' litigation continued from 1988 until 1992. Sometime in April 1991, Broadcort sold all of the stock in the Steins' personal account, including 3,500 shares of Saztec stock that were in the account at that time.  We note that this is 2,000 shares less than the number of Saztec shares held in the account on April 25, 1987.  The record does not explain how or when the 2,000 shares were disposed of.  The 3,500 shares of Saztec stock were sold for approximately $4 a share.  Broadcort retained all of the cash realized from the sale of stock in the Steins' account.

In April 1992, Mr. and Mrs. Stein agreed to settle their suit against Steinberg & Lyman, Broadcort, and others.  The terms of the settlement are confidential and are not contained in the record of this case.  When Mr. Stein received the proceeds of the settlement, he allegedly took a portion of the proceeds that he considered to be related to 2,000 shares of Saztec stock (the record does not state how much) and placed that amount into an IRA rollover account.  Mr. Stein had created the IRA rollover account in 1988 when the subject pension plan terminated

and all of the plan's assets were distributed into the IRA rollover account.

The Partnership's Return Position

On its Form 1065, U.S. Partnership Return of Income, for 1986, the partnership deducted total contributions to defined benefit plans on behalf of its partners in the amount of $1,212,474.90. Of that amount, $20,611 had allegedly been contributed to Mr. Stein's defined benefit plan, a contribution of $4,111 made to the plan on June 24, 1986, and the alleged contribution of 2,000 shares of Saztec stock, valued at $16,500, described above.

Respondent issued a timely notice of FPAA to the tax matters partner. In the notice, respondent adjusted the deduction claimed by the partnership for contributions to defined benefit pension plans, from $1,212,475 to $1,195,975. Thus, respondent disallowed the partnership's deduction of $16,500, the value of the shares of Saztec stock which the partnership claimed to have contributed to the plan. The notice describes this adjustment as follows:

> The contribution of $16,500 deemed to have been
> made to the Reed Smith Shaw & McClay/Arland T.
> Stein Defined Benefit Pension Plan (No. 125) is
> disallowed because you have failed to establish
> that the contribution [of] 2,000 shares of

Saztec International Common was paid into the plan within the meaning of Section 404 of the Internal Revenue Code.

OPINION

The issue for decision is whether the partnership is entitled to deduct $16,500 on its 1986 return, pursuant to section 404(a), for an alleged contribution of stock to a defined benefit plan established for one of its partners, Mr. Arland T. Stein.  Respondent disallowed the deduction in the subject notice of FPAA, and the tax matters partner bears the burden of proving that this adjustment to the partnership's 1986 return is wrong.  Rule 142(a).  All Rule references are to the Tax Court Rules of Practice and Procedure.

Under section 404(a)(1)(A), contributions to a qualified plan are deductible only "In the taxable year when paid".  See also secs. 1.404(a)-1(c), 1.404(a)-3(a), Income Tax Regs.  However, section 404(a)(6) provides that a payment is deemed to have been made on the last day of the preceding taxable year if it is made on account of such taxable year and "is made not later than the time prescribed by law for filing the return for such taxable year (including extensions thereof)."  In this case, the

partnership's return for the 1986 taxable year was due on or before April 15, 1987.  See sec. 1.6031-1(e)(2), Income Tax Regs.  The return was filed at that time with no extensions.  Accordingly, in this case the tax matters partner must demonstrate that the partnership paid the 2,000 shares of Saztec stock to the trust on or before April 15, 1987.

For purposes of section 404(a)(1) and (6), the terms "paid" and "payment" mean that all taxpayers, regardless of their method of accounting, must pay cash or its equivalent within the statutory deadline in order to qualify for the section 404(a) deduction.  See Don E. Williams Co. v. Commissioner, 429 U.S. 569, 579 (1977).  In the Don E. Williams Co. case, the Court explained:

> The statutory items "paid" and "payment," coupled with the grace period and the legislative history's reference to "paid" and "actually paid," demonstrate that, regardless of the method of accounting, all taxpayers must pay out cash or its equivalent by the end of the grace period in order to qualify for the § 404(a) deduction.
>
> This accords, also, with the apparent policy behind the statutory provision, namely, that an objective outlay-of-assets test would insure the integrity of the employees' plan and insure the full advantage of any contribution which entitles the employer to a tax benefit.  [Id. at 578-579.]

We have applied the objective outlay-of-assets test in a number of cases. For example, we have held that an employer's accrual on its books of its liability for a plan contribution does not constitute "payment" of the contribution for purposes of section 404(a). See <u>Gillis v. Commissioner</u>, 63 T.C. 11 (1974). Similarly, we have held that there was no "payment" under section 404(a) when an employer merely designated on its books and on the books of the plan that a portion of a certificate of deposit belonged to the plan. See <u>Rollar Homes, Inc. v. Commissioner</u>, T.C. Memo. 1987-166. An employer must irrevocably set aside the contribution for the plan or remove the contribution from the employer's direct control in order to qualify for a deduction under section 404. See <u>Gillis v. Commissioner</u>, <u>supra</u> at 17; <u>Rollar Homes, Inc. v. Commissioner</u>, <u>supra</u>. In <u>Gillis v. Commissioner</u>, <u>supra</u> at 17, we stated:

> Congress has hedged deductions for deferred compensation with a host of requirements which are designed to assure, as a condition to deductibility, that the funds are irrevocably set aside for the employee-beneficiaries' benefit within prescribed periods of time. Otherwise, the payments might never be made in cases of insolvency, bankruptcy, or other unforeseen conditions. * * *

We have allowed a deduction under section 404(a)(1) where the employer presented credible evidence that the contribution had been transferred to a trust account for the plan.  See Busch v. Commissioner, T.C. Memo. 1983-98, affd. 728 F.2d 945 (7th Cir. 1984).

At the outset, we note that none of the shares of Saztec stock that were owned by the Steins on April 7, 1987, when they executed the contribution agreement and ratification were ever transferred into the name of the partnership, into the name of the trust, or into Mr. Stein's name as trustee of the trust.  In fact, all of the stock in the Steins' Broadcort account, including the Saztec stock, became subject to the standstill agreement between the Steins and Broadcort and/or Steinberg & Lyman, described above, and in April 1991 were sold by Broadcort. Broadcort then retained the proceeds from the sale of that stock, including all of the Saztec stock owned by the Steins, when their account was liquidated, until April 1992 when Broadcort disbursed part or all of the proceeds to Mr. Stein in connection with its settlement of the Steins' lawsuit.

Notwithstanding the above, the tax matters partner argues that the partnership contributed the stock to the

plan prior to April 15, 1987, and is entitled to deduct the value of the stock on its 1986 return.  The tax matters partner claims that the partnership obtained the stock from Mr. Stein, the sole participant of the plan, and simultaneously contributed it back to Mr. Stein in his capacity as trustee of the trust that formed a part of the plan.  The tax matters partner claims that the contribution took place on April 7, 1987, when Mr. Stein and the partnership executed the contribution agreement and Mrs. Stein ratified the agreement.

As a preliminary matter, we must dispose of the tax matters partner's factual contention that the broker, Broadcort, and its agent, Steinberg & Lyman, failed to follow Mr. Stein's instructions to transfer 2,000 shares of Saztec stock from his personal account to a new account for the trust.  The tax matters partner makes this factual contention, based upon Mr. Stein's testimony at trial that, after executing the contribution agreement, Mr. Stein orally instructed the broker to open a new account in the name of the trust and "to put the shares that were the subject of this assignment in the separate account."  The tax matters partner further claims that Mr. Stein inquired of his broker and the broker's assistant and had "several

heated discussions" with them about why the transfer had not been made.  The tax matters partner argues that the failure of the broker and/or agent to follow Mr. Stein's instructions "was not only inconsistent with their relationship to Mr. Stein, but was fraudulent and probably bordered on being criminal in nature."

There is nothing in the record to corroborate Mr. Stein's alleged instructions to his broker.  Neither Mr. Stein, in his individual capacity or in his capacity as trustee of the trust, nor the partnership issued a written notification or instructions to the broker.  Neither Mr. Stein nor the partnership ever sent the broker or its agent a writing to confirm any such oral instructions. The record contains no confirmation from the broker or its agent regarding the alleged instructions.  Similarly, the record contains no statement from the broker or its agent on which the transfer is noted.  Significantly, the record contains no books and records of the trust on which the transfer is noted.  The record contains no valuation of plan assets on which the transfer is reflected.  There is no mention of this allegedly "fraudulent" or "criminal" conduct in the Steins' lawsuit against the broker and its agent, and the lawsuit was settled and no fraud or criminal

conduct on the part of Broadcort or its agent was ever established.

We note that Broadcort and its agent sold 4,500 shares of Saztec stock from the Steins' account in April 1987, presumably on Mr. Stein's instructions. We are at a loss to understand why Broadcort and its agent would follow Mr. Stein's instructions to sell 4,500 shares of Saztec stock from the Steins' account but would not follow his instructions to put 2,000 shares into an account for the trust. Moreover, if legal title to the subject Saztec stock had been transferred to the trust, as the tax matters partner claims, and if Mr. Stein had notified his broker of that fact before a dispute arose between them, we do not understand why Mr. Stein would have entered into a standstill agreement covering all of the stock in his account, including the trust's 2,000 shares of Saztec, and would have permitted the Saztec stock to remain in his personal account in derogation of this instruction.

In sum, we find nothing in the record to corroborate Mr. Stein's testimony concerning the actions he allegedly took to complete the transfer of the 2,000 shares of Saztec stock to the trust or to establish the tax matters partner's allegation that Broadcort and its agent acted

fraudulently or criminally.  Of course, we are not required to accept the self-serving testimony of an interested witness.  Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); cf. Jones v. Commissioner, T.C. Memo. 1997-368.  In this case, we do not credit Mr. Stein's testimony on this point.

The principal argument of the tax matters partner is that execution of the contribution agreement and ratification by themselves constituted an assignment by Mr. Stein and his wife of "all of their right, title and interest in and to 2,000 shares of Saztec to Petitioner." The tax matters partner further describes the contribution agreement as "an immediate assignment of all of Petitioner's right, title and interest in those shares" to the trustee of the subject defined benefit plan.

The tax matters partner notes that the 2,000 shares of Saztec stock were held in "street name" in the Steins' account and argues that execution of the contribution agreement was the only act required to transfer ownership of the stock from Mr. and Mrs. Stein to the partnership and from the partnership to the trust.  He further argues that, after the contribution agreement was executed, the Saztec stock was placed irrevocably beyond Mr. Stein's personal control, and any action by Mr. Stein with respect to the

stock would constitute criminal conduct. Thus, according to the tax matters partner, the partnership received legal title of 2,000 shares of Saztec stock from Mr. Stein and made a timely contribution of the stock to Mr. Stein's defined benefit plan. Accordingly, the tax matters partner argues, the partnership is entitled under section 404(a) to deduct the value of the stock allegedly contributed to the trust.

The tax matters partner argues that this case is governed by the opinion of the U.S. Court of Appeals for the Third Circuit, the court to which an appeal would lie, in Dick Bros., Inc. v. Commissioner, 205 F.2d 64 (3d Cir. 1953), revg. 18 T.C. 832 (1952). In that case, the Court of Appeals held that the taxpayer's contribution of a check to an employee's pension trust was timely and that the taxpayer was entitled to deduct the amount of the check. According to the Court, the check and a transmittal letter signed by the three members of the pension committee were left with the taxpayer's treasurer, who was also a member of the pension committee, on February 28, the day before the contribution was due; viz, March 1. By letter on Monday, March 4, the trustee acknowledged receipt of the check and letter from the pension committee. This Court

had sustained the Commissioner's determination that the contribution was untimely because it found "no evidence to show that delivery of the check to the Trustee occurred on or prior to the expiration of the statutory period on March 1, 1946." Dick Bros., Inc. v. Commissioner, 18 T.C. at 835. The Court of Appeals reversed this Court and held that

> proof that the letter and check were given to Dick on the fifty-ninth day, when there remained ample time for the check to be delivered to the Trustee, either personally or in the ordinary course of the mails, within the sixty day limit, gave rise to a presumption that they were so delivered. Since there is no evidence in the record in the slightest degree inconsistent with this presumption, it must stand, and the taxpayer is entitled to the deduction.

Dick Bros., Inc. v. Commissioner, 205 F.2d at 66. Thus, the Court of Appeals utilized a presumption "'that every man, in his private and official character, does his duty, until the contrary is proved'". Id. (quoting Bank of the United States v. Dandridge, 25 U.S. (12 Wheat.) 64, 69 (1827)).

The Court of Appeals also found that the employer "delivered the check to the [pension] Committee and the latter gave it to Dick 'for delivery' to the Trustee."

Id. at 68.  In view of the fact that the committee "was part of the 'package' of the Trust", the Court held that delivery of the pension fund check to the pension committee "constituted delivery to the trust."  Id.

Thus, the tax matters partner argues in the instant case that delivery of the contribution agreement and ratification to Mr. Stein, the trustee of the trust, had the same effect as delivery of the check in Dick Bros., Inc. v. Commissioner, supra.  According to the tax matters partner, the execution and delivery of the contribution agreement and ratification transferred legal title to the underlying stock from petitioners to the partnership and back to Mr. Stein as trustee of the trust.

We agree with the premise of the argument made by the tax matters partner that the partnership must have received and must have transferred legal title to the Saztec stock to the trust.  Otherwise, if legal title to the underlying stock was not transferred to the trust, it would be difficult to find that the trust had received anything and that there had been "an outlay of cash or other property" as necessary in order to qualify for the section 404(a) deduction.  See Don E. Williams Co. v. Commissioner, 429 U.S. at 578-579.

We disagree with the tax matters partner that the contribution agreement and ratification effect the transfer of legal title to the Saztec stock to the partnership and then to the trust. First, as we read it, the contribution agreement is not an unconditional assignment and transfer of the underlying stock. Under its terms, it operates only to the extent that the partnership is obligated to make contributions to the plan and Mr. Stein is obligated to reimburse the partnership for those contributions. However, as quoted above, section 8.2 of the plan document states that the plan is entirely voluntary on the part of the partnership and further states that "its continuance and the payment of contributions hereunder are not assumed as contractual obligations of the Firm [partnership] and the Plan shall have no cause of action against the Firm." We note that the partnership may be subject to excise tax under section 4971 if there is an accumulated funding deficiency for a plan year computed as of the end of the plan year. Secs. 412(a), 4971(a). However, the disclaimer further states that "The fact that the Firm becomes subject to any tax or penalty by having failed to make a contribution shall not give rights under or to this Plan to require contributions." In light of this disclaimer by the

partnership of any obligation to make a contribution to the plan, we have difficulty reading the contribution agreement as an unconditional assignment and transfer of the underlying Saztec stock from the partnership to the trust.

Moreover, the contribution agreement states that Mr. Stein transferred the Saztec stock to the partnership in satisfaction of his obligation to reimburse the partnership for amounts that the partnership becomes liable to contribute. However, we find nothing in the plan document or trust agreement that imposes such an obligation on Mr. Stein. The tax matters partner does not explain, and it is not readily apparent to the Court, the legal basis for Mr. Stein's obligation to reimburse the partnership for its contributions to the plan. Accordingly, we have difficulty reading the contribution agreement as an unconditional transfer of the underlying stock from Mr. Stein to the partnership.

Second, it is often noted that the nature of a property right is determined under State law and the treatment of the transfer of such a property right for Federal tax purposes is determined under Federal law. United States v. Mitchell, 403 U.S. 190 (1971); Morgan v. Commissioner, 309 U.S. 78 (1940); Burnet v. Harmel,

287 U.S. 103 (1932); <u>Autin v. Commissioner</u>, 109 F.3d 231, 233-234 (5th Cir. 1997), revg. and remanding 102 T.C. 760 (1994); <u>Estate of Vissering v. Commissioner</u>, 96 T.C. 749, 755-756 (1991) ("It is virtually hornbook law that State law determines the legal interests and rights created by a trust instrument, while Federal law determines the Federal tax consequences of those interests and rights."), revd. and remanded on other grounds 990 F.2d 578 (10th Cir. 1993). The tax matters partner has not shown that the partnership transferred legal title to 2,000 shares of Saztec stock under Pennsylvania law prior to April 15, 1987.

Section 8301 of the Pennsylvania Commercial Code provides that on the "delivery" of a security, the purchaser acquires the rights in the security which his transferor had or had actual authority to convey. 13 Pa. Cons. Stat. Ann. sec. 8301(a) (West 1984). Section 8313 of the Pennsylvania Commercial Code prescribes when delivery of a security to a purchaser is deemed to occur. See 13 Pa. Cons. Stat. Ann. sec. 8313 (West 1984); see also <u>Wagner v. Hart Chem. Co.</u>, 597 A.2d 1208 (Pa. Super. Ct. 1991), alloc. denied 617 A.2d 1275 (Pa. 1992). As applied to the

taxable year in issue, section 8313(a) of the Pennsylvania
Commercial Code provides:

> Delivery to a purchaser occurs when:
>
> (1) he or a person designated by him acquires possession of a security;
>
> (2) his broker acquires possession of a security specially indorsed to or issued in the name of the purchaser;
>
> (3) his broker sends him confirmation of the purchase and also by book entry or otherwise identifies a specific security in the possession of the broker as belonging to the purchaser;
>
> (4) with respect to an identified security to be delivered while still in the possession of a third person when that person acknowledges that he holds for the purchaser; or
>
> (5) appropriate entries on the books of a clearing corporation are made under section 8320 (relating to transfer or pledge within a central depository system).

For purposes of section 8313(a) of the Pennsylvania
Commercial Code, the term "possession" means "physical"
possession of the security.  Wagner v. Hart Chem. Co.,
supra at 1215.

In this case, the tax matters partner has not shown
that delivery of the Saztec stock was made to the trust
under section 8313(a) of the Pennsylvania Commercial Code
between April 7, 1987, when the contribution agreement was

executed and April 15, 1987, when the partnership filed its 1986 income tax return. As discussed above, the Saztec stock remained in the Steins' personal account until 1991. Thus, neither the trust nor Mr. Stein, acting as trustee, obtained physical possession of the stock. Furthermore, there is no evidence that the trust or Mr. Stein, acting as trustee, designated Broadcort or its agent, Steinberg & Lyman, to acquire possession of the Saztec stock on the trust's behalf, and there is no evidence that Broadcort or its agent recognized any interest of the trust in the Saztec stock. Thus, we cannot find delivery to the trust under section 8313(a)(1) of the Pennsylvania Commercial Code. Similarly, there is no evidence that the Saztec stock was specially endorsed to or issued in the name of the trust. Thus, we cannot find delivery to the trust under section 8313(a)(2) of the Pennsylvania Commercial Code. Furthermore, neither Broadcort nor its agent sent a confirmation that it was holding the stock on behalf of the trust. Thus, we cannot find delivery to the trust under section 8313(a)(3) of the Pennsylvania Commercial Code. Finally, neither section 8313(4) or (5) of the Pennsylvania Commercial Code is applicable to the facts of this case.

The tax matters partner has not established that the partnership paid 2,000 shares of Saztec stock to the trust on or before April 15, 1987.

In light of the foregoing,

<u>Decision will be entered for respondent</u>.